1642-59, 1741-35, Nicholas Siewertsen v. Worthington Industries. Arguments not to exceed 15 minutes per side. Ms. Knoll for the appellant. Good morning, Your Honors. I have reserved six minutes for rebuttal time. Thank you. My name is Laryn Knoll, and along with my co-counsel, Danny Caudill, we represent Nicholas Siewertsen, who is here with us today, and his wife, Amanda. Nicholas Siewertsen worked for Worthington Industries, driving motorized vehicles, including the forklift, for 11 years prior to an email sent by Mr. Hoover saying that he should not be driving it. All roads, all issues in this case come back to those two facts. The jury got it right. The jury got it right. They held for Mr. Siewertsen. They said that he is not a threat to the safety of himself and others. Now, did the jury hear the information that during that period of time there were almost two near accidents? Yes, ma'am. They certainly did. They also heard from Mr. Siewertsen that he was not aware of those until we got to litigation. All of the Worthington Industry witnesses stated that the pedestrian has a right of way. The pedestrian in one, the actual documented near miss, Mr. Siewertsen was the pedestrian. So he was not to be at fault. They needed an excuse to take him off after he said this is discrimination and went into litigation. The second one, despite OSHA regulations, saying this is a big deal, despite Mr. Lamb, the health and safety guy for Worthington, saying this is a big deal, near misses, you have to document, he didn't document. I'm not sure I follow why that matters. The jury heard them. They made a determination. That's right. Can't they consider that and make a determination? They can. They did. It was manufactured in that evidence, or it was manufactured to make up a reason for their decision. But even if they were near misses, they could conclude differently than you're surmising that the near misses were the result of something other than him being deaf. I don't understand why, I guess, you have to justify them. Well, it will come into damages later, and Mr. Campbell is going to come up here and tell you that's why he's not safe. They're trying to use those things to circumvent the required individualized inquiry under the ADA when you assert the affirmative defense of direct threat. They did not do that, and that's what the jury found. That's why Mr. Sewardson won this trial, or why the jury held for Mr. Sewardson. That's why that's important. So in coming back to the 11 years, Keith v. City of Oakland, and then Backhouse, which cited Keith v. City of Oakland, Backhouse said that past experience must be considered by the employer when conducting an individualized inquiry, which didn't happen. And the reason that the 11 years is important here is, number one, to show he's fully competent. There's no safety issues. He's on the Safety Council. But it also goes to his ability to testify to his own damages, because he knows how it works inside Worthington Industries. He knows how people are promoted. He knows how the pay levels work, and he testified to that. Did he lose any monetary consequences as a result of the change in position? Well, he had the same. The quick answer is he had the same hourly rate. But moving him back to the entry-level positions put him in a pay level one, where he was in a pay level two. And that's a problem, because Nick testified that his supervisor told him he could not give him big pay raises because he was going to top out of his pay grade. He could not go into a pay level two because of the position. It was a lost opportunity versus a lost wage. Well, it's both. But he hadn't suffered the lost wage yet. That's the point, I think. But you're saying he could not give him promotions, but he didn't lose a promotion during the time. That event had never occurred, where he had the opportunity for the advanced wage. Well, I think the answer, and we can backtrack if I'm answering your question, the problem with going back to a pay level one and being restricted to these three entry-level positions was that when he went, he was not even allowed to apply for anything. He was told he cannot apply for anything. I think we understand all of that. The point is his wages didn't change. It's the opportunity that changed, because that opportunity never came to fruition because he left. Two things on that. Yes is a quick answer, but I have to qualify that. He got smaller raises because he was going to top out. Was he there to get smaller raises? I'm sorry. I'm sorry, what was your question? Did he stay and get smaller raises? Yes. He's actually still employed. Oh, he's still in the position. Well, I'll come back to that. He's back in the shipper department now, isn't he? No, he's not. He is not right now. But let me go back to what's going on. So the pay level one that he was in, he was getting raises at a very smaller rate to avoid topping out in his pay level. So he should have been making more money because of that. So there are back wages. When that happened, it affected his profit sharing, because Worthington does profit sharing based on your actual wages. And then because he was not able to drive motorized vehicles, all of Nick's overtime dealt with filling in with people all over the plant. So he needed to drive forklifts, and he testified, you could come in on a weekend and you could load and unload. So those are the three ways that money was actually lost. And then because he was relegated to the pay level one in these three entry level positions, he then had a loss of opportunity. And we listed in our brief, and there was plenty of evidence during the trial, where he talked about positions not only that he went ahead and applied for, because he was just frustrated how ridiculous this was, and then ones that he didn't apply for because they told him he couldn't. But he didn't get any of them. Can you explain? Can I take you off a different issue? Yes, sir. Is that all right? Well, you get to do that. No, I just wanted to make sure you were done. But on the Rule 50B motion, I'm not sure I understand why a Rule 50B wasn't filed. Because, and I apologize for this, this was not the – the problem is that there is an order, and it's document 178, Order Confirming Stipulation Resolving All Issues for Trial and Preserving Identified Issues for Appeal. All my issues were identified in this document. I actually have a copy if you would like. Or it's in the record at 178. Okay, so 178, and can you go over the issues you raised now, the back pay, the punitive damages, those, are those in there? Yes, sir. It is in – And just so I'm clear, in the party stipulate, I'm sorry to cut you off, I'm just going to accept, yes, it's in there. The parties, because your time is running out, the parties stipulated that those issues could be raised on appeal? Well, the name of the order is Preserve for – Identified Issues Preserved for Appeal. And this was Worthington's suggestion. So we crafted the stipulation to move forward with the trial. We knew there was going to be an appeal. We thought it was going to shortcut some stuff, but it didn't. But within that, in paragraph 3, it says that 3A, the court denied an airing – well, we did not do the summary judgment – but all motions, orders, objections, and arguments related to liability phase. We're requiring him to – and requiring him to prove the issue of adverse employment action at trial. That's liability. What about damages? Well, the damage – yes, the damages go – C, or D, the court aired bifurcation of the trial. Denying motion to exclude is E. F is granting motion to exclude our expert witnesses on damages. F is punitive damages. G is back pay. And H is the declaratory judgment regarding the blanket policy. So it was all spelled out. Okay. I see my time is up. Thank you, counsel. May it please the court, my name is David Campbell. I'm here with Aaron Williams on behalf of Worthington Industries, Inc. I want to focus on the liability in this trial because we think it's very clear as to the essential functions of the position. And let me give a brief discussion of this plan. Before you get there, can I just ask one question? Absolutely. I just want to understand Order 178, or Document 178. So do you concede that you stipulated that these issues could be raised on appeal in 178 or that they were preserved, the back pay and punitive damages? We in no way could stipulate as to the merits or whether a Rule 50 or anything like that was filed. We simply were saying that at that point in time we're wrapping things up and everybody was saying, look, whatever rights we have, we have. It's like a tolling agreement. I couldn't extend a statute of limitations. In that document, though, what does the phrase preserved for appeal mean in your mind? It means exactly that. Whatever I had that day, here it is. We're wrapping it up. And I think the key point for us was the fact that he was going to remain employed but not coming into the shipping department as to that not operating the forklift. But you use that language, preserved for appeal, which would suggest that, okay, all of these issues are preserved for appeal. Well, they certainly are here on appeal. I could not grant rights that she did not have, that he did not have. Was this after the time for filing a Rule 50 had lapsed? Yes, yes. I mean the punitive damages that the judge found should have been addressed in the liability phase as to it. And then he ultimately concluded that because there was no request for an instruction, and then he ultimately concluded that through our argument, that was one of the grounds that he did not. You mean the basis for punitive damages, not the damages itself, should have been addressed for the liability. Yes. Okay. Now, as to the essential functions, let me describe this plan. We have a request for admissions. Can I ask you one? I'm sorry. On this 178, does the document say something to the effect that it doesn't create any rights, it simply preserves whatever rights you have, or something to the effect? It says we preserved it. I mean I couldn't create it. So why create the document? In other words, you either preserve them or you don't. Why do you need to create the document? Your Honor, it addressed a lot of other issues. Our primary issue at that time is I believe we took away from the jury the damage issue, the one damage that was left, the emotional distress, and we took that away and we said we're going to agree to this amount. And so because of that, because we weren't getting to the actual jury verdict, we wanted to have something that set it for the record. All right, I'll go read the doc. Okay, thank you. I think that it's irrelevant for the appeal because of the fact that the essential functions of this position are so clear. This is a plant that manufactures steel coils. The steel coils, it's undisputed, are extraordinarily heavy. It's a very busy plant with trains coming through at times, trucks coming through, forklifts moving, C-hooks moving. And just so everybody understands, a C-hook is a crane that the employees can operate from a handheld remote that is moving along the ceiling of the plant. We have forklifts moving, multiple forklifts at any one time. Most importantly, the shipping department employees are not wearing ear protection, and all the employees testified that they audibly communicated. And so that audible communication and the plaintiff testified as to it. He testified that when he drives his forklift, when he does a C-hook, he honks the horn multiple times, and he does it so much that the employees say, you don't need to do it this much. And the reason why he said he did that is because he wanted everybody to know he's coming. And so the inverse of that, obviously, is that if he's honking the horn to let everybody know he's coming, his co-workers are doing the same. He, however, can't hear the horn being honked on either the C-hook or the ---- But he did it for 11 years, right? He absolutely did not. The record in this case is that he, and it's undisputed, he was in the production setting. He was hired in 1999. We knew he was a deaf employee. There's the allegations of somehow this ill will or whatnot. He was hired. His father has worked at Worthington for years and years and years. He worked on the production line. He worked on the slitter line, the pickle line. And in that case, yes, every now and then ---- So how long did he drive the forklift? He drove the forklift the longest from 2009 to 2011. It was actually shorter. What happened is we had a reduction in force due to the financial crisis. Rather than eliminating his position, they moved him over to a position in the shipping department, and he slowly progressed into a shipper. And that's where the two near misses came in. So no way shipper form is a record support that he was a shipper for 11 years. The shipper position, just so we're clear, he has to navigate this plant. There are steel coils that are up, and it's undisputed, and the emissions show. He can't see around. If he looks around to see, there's a forklift coming with a steel coil. And so, obviously, if I walk around ---- Why isn't this a jury question? I mean, all of this was in front of the jury. The jury made a call. I'm not sure I follow. The jury made a call, but the call, quite frankly, was against the weight of the evidence. The undisputed evidence, the emission responses show that audible communication is an essential function of this position. His own experts ---- Is the weight of the evidence clear? Not even sufficiency? There is no way a reasonable jury could conclude that he can perform the essential functions. He's not asking for reasonable accommodations. He admitted that he doesn't want accommodations. He can't comply with the work rules. If you can't comply with the work rules, and the work rules say as you're coming up to that where you can't see the other side, you slow down, you honk your horn, and then you slowly come around. He can't hear that other horn. We had two near misses. He said he heard vibrations, right? She got up and explained it to us, but they also explained the near misses to the jury, and the jury didn't accept it. We don't know what the jury accepted or didn't accept. Just because you say you had two near misses, the jury gets to hear that and decide whether or not those are actually near misses. Our standard of proof isn't that as soon as he gets on a forklift or as soon as he works in the shipper position, he's going to die. That's not what we need to prove. We need to prove can he follow the rules? He says the rules are, and the rules when you get on a forklift, you must check first of all, is the horn working? Okay? If that horn's not working, you're not allowed to operate that forklift, number one. Counsel, didn't the jury hear all of this and evaluate all of the evidence and the credibility of witnesses, and after hearing the case and all of those things that you bring up, didn't they find in favor of the then plaintiff? So if you're saying that he can't be able to do this, that's the same claim that was pressed to the jury, and they rejected that found differently. Without question, the jury rejected it. That does not mean that the jury, if they do not have evidence that shows that he can perform the essential functions of this position without reasonable accommodation, that verdict needs to be overturned, and in this case it must. In this case, as I said, when he gets on that forklift, he has to make sure that the horn works. If it doesn't work, that forklift can't be operated. When he's operating that C-hook, he has to make sure that that horn works. So his checking the horn by virtue of the vibration, that's not sufficient? Well, that's one piece. Let's say that he can press it and he feels a vibration. The key point is this. He's coming to a corner. There's steel coils. You're driving a forklift. I'm driving a forklift. I can't see you. These coils are higher than me. If I poke my head around, a steel coil could take my head off. So I'm coming up, you're coming up. He can't feel vibration from 15 feet away. I mean, there's no evidence of it. I mean, you have to honk. So to put him in the shipper position and to have him walking through the steel coils, I asked his own expert, are you an expert in issues as to pedestrian safety in these areas? Yes, I am. Can I ask you a question? And I'm sorry to interrupt you, but did he testify that he could feel the vibrations and then his expert supported that? No, he did not. He did not. He did not testify that he could feel vibrations from 20 feet away. There's steel coils up there. It's impossible to feel. Well, I'm not asking if it's possible or not. I'm asking if he testified to that. I thought he did say that. He did not. And a juror's . . . So do you lose if he said that and the jury accepted that? One, he didn't say it. Two, I don't think we could lose because it's not a fact that is admissible. His expert didn't testify to it. Sure, it's admissible. If he testifies to it, it's admissible. Okay, it's not a fact that a reasonable juror could conclude that . . . Because you're saying he didn't testify to it. I would urge the court to review the transcript because he didn't testify to it. Okay. And I would also say that just because somebody comes in and says, for example, that I could fly a plane but I'm blind, doesn't mean that the jury can say that I can fly the plane. I need to have facts that are credible facts. Sure, but if you say I'm blind and I can fly a plane and then you have an expert testify how blind people fly planes, surely that's sufficient. Well, there's no expert here who is a hearing expert who said that somehow through 18,000-pound steel coils that I'm 20 feet away, that I can somehow feel vibration of a horn. There's horns all over the plant going on. I mean, he testified that he honks everywhere. And so from our standpoint, Your Honors, if he believes, and it's pursuant to our rules, that you must use the horn in order to operate the C-hook, in order to operate the forklifts, and then most importantly, in order to perform his duties. He's walking around this plant, no ear protection. He's walking around where he has steel coils, where he can't see what's around that corner. And to think that we're going to permit him to walk around in that plant with those forklifts or, more importantly, he's going to be potentially being hit by hitting another forklift or hit, those are issues. But the issue isn't a matter of, hey, let's gamble, and he did it for six months and didn't die, and so therefore he can do it. The issue is, can he follow our safety rules? The Sixth Circuit has confirmed reasonable safety rules are appropriate. In this case, he's not asking for any accommodations. And, Your Honor, I would submit that if he's not asking for any accommodations and he can't follow the safety rule, it doesn't matter if the vibration is there or not. He has to slow down, not stop as he's coming up. That's an OSHA regulation, our rule. He has to honk and he has to listen for the other horn. If he hears another horn, he must stop. If he doesn't, he can continue to go. If he's walking, he must do the same. So from our standpoint, this is a clear cut. The jurors did not have any evidence that found without reasonable accommodations, and that's their position. We don't need any accommodations. He can't perform the work rules. He's omitted the work rules. And I will submit that the admissions, on top of the fact that he omitted to all these facts that there's obstructed views, that on the C-hook, they communicate audibly. And then most importantly, the court found, at summary judgment, the court found that an admission that not only did he omit to, but I also showed it to him at his deposition, and he testified to the veracity again. And so this is an admission that he omitted to and deposition testimony that he verified. Admit that operators of the C-hook must be able to hear audible sounds in order to avoid injury to others. So that's what he's omitted to. That's what he's testified to. So they claim he's qualified to operate forklifts, overhead cranes, and other motorized vehicles because you certified him to operate them, and he did so for 11 years. So that's where I was referencing. You're saying that's all wrong. He, for 11 years, he worked, and it's on page 5 of our brief, he worked as a seasonal employee, he worked on the Slitter line, and he worked on the Pickle line. The shipper position, I think, is important to look at what the essential functions are. He must operate forklifts, yes. He must operate a C-hook. I'm sorry, on the Slitter line and the Pickle line. The Pickle line is where he worked for eight years. The manufacturing line, yes. He didn't operate any of them. He may have at a point taken a forklift to go down the line and pick up a steel coil and come back. Here, he's got to go through trucks that are non-Worthington employees who are honking. He admits in his admissions that they honk. So how is he going to hear the honk? He's got to navigate the train that comes in our facility. He then has to go pick up coils on a forklift way back in the plant. And so in order to do that, he has obstructed views, which he's admitted to on his conclusive facts under Rule 36. He's admitted to there's obstructed views. So with obstructed views and with other forklifts, how is he going to operate without hearing? You've told us that. I thought Judge DePauw was taking you up to when he was hired for this specific position that required him to operate the forklift throughout the plant. How long had he been operating, or when did he get promoted to that position where he had to operate the forklift throughout the plant and go around these blind corners and all that? When did that happen? In 2009, there was a reduction of force, and they moved him over to the shipping department. At that point in time, it's undisputed, he didn't have all the duties. But as the plant picked up, he began to start doing more of the shipper duties. And so sometime in either late 2009 or 2010, he did it until early 2011, and that's when we had the two near misses. The two near misses, just so we verify, we hear about the pedestrian has a right-of-way. Well, on one of them, he's looking up at a C-hook, and a forklift is honking, and they almost run into him. On another one, he almost runs into somebody because his horn wasn't working, and he didn't know. His horn wasn't working, and he didn't know. And so from our standpoint, and the near misses are only relevant to the fact to show that, look, this is a very dangerous plant. This is a plant where audible communications are necessary and essential. The rules require it. He can't comply with the rules. I understand a jury, and a jury hears and sees Mr. Sewardson, and a jury says he's been here, and they argue that he's driven forklifts for 10 years. I get a jury, and I understand that, but in this case, we asked Judge Zuhari, and I think, quite frankly, he didn't give us the, because this was Judge Carr's case, he didn't look at the legal issues as he normally does. Normally, we have oral argument. He gives us questions of fact. We answer questions before our oral argument. On the Rule 50, we just got a decision. Let me go back to that. I'm looking at Paragraph 4 of Document 178, which says, the parties agree and acknowledge that Paragraphs 2 and 3, those are the two that set out all of the various things that you're stipulating to that are intended to preserve all arguments for appeal other than arguments as to the damage amount, and that neither party will use this stipulation to argue that arguments may not be made on appeal. What does that mean? It simply means that we got to the point with the jurors where we said, look, instead of having the jurors come back with an emotional distress damage, we don't want Mr. Sewardson during the course of the appeal working in the shipping department. It was important to us that we were able to have him working in a position that was safe for him and for others during the course of this appeal. We entered into a stipulation which was part of a settlement where we took it away from the jury as to the emotional distress. What that means is we said, look, we're going to set the amount, and quite frankly, she's violating the order because she's coming in and saying that this order somehow, this stipulation somehow gives her arguments. I think that the bottom line is this was just simply something that said, look, we've reached an agreement. Go file your appeals, which she, I believe, had already done or did shortly thereafter. I believe she did it even before this phase. In our view, we shouldn't be arguing it. It says you are not to argue it on appeal. I couldn't give her additional rights, and neither could they. If I didn't file Rule 50. Paragraphs 2 and 3. Example 3 starts out, In entering this stipulation, Sewardson does not waive the following objections to the rulings of the court identified above, and he expressly retains the right to pursue these issues and objections on appeal and through any post-judgment motions. A, the court erred in denying plaintiff's motion for summary judgment. B, all motions, objections, orders, and arguments relating to the liability phase, including but not limited to court's ruling that Sewardson was required to prove the issue of adverse employment action at trial. C, the court erred in denying plaintiff's motion for directed verdict. D, the court erred in its bifurcation of the trial. E, the court erred in denying Sewardson's motion to exclude Worthington's expert, David Hoover. F, so he doesn't waive those, and the next paragraph says, the parties agree and acknowledge that paragraphs 2 and 3 are intended to preserve all arguments for appeal other than arguments as to the damage amount. I'm just trying to figure out what that means in your head. What that means in my head is that we are done with the trial today. That's what we were being done with. And that as to the amount there, we filed our Rule 50 after this, and they filed motions in opposition and filed motions as well. There was absolutely no way, shape, or form that we weren't filing our Rule 50. We were preserving our arguments, and we did. We filed our Rule 50 motion. It was briefed extensively. If the district court judge, who was there for that, believed that somehow these issues didn't need to be briefed, we would have immediately went up to appeal, Your Honor. All it was saying is that day is we are saying, I'm not going to use this order. I'm not going to use an agreement that the judge was pushing us. It was Friday afternoon. Let's get this case done, and we're not going to use this agreement, this on emotional distress, to argue on appeal, as she's doing here. And the key point is not to use that stipulation to argue on appeal. Your Honor, it did in no way, shape, or form excuse them to file their Rule 50 motions. And if it would have, they would have explicitly stated that in there and said that they don't have to file it. From our standpoint, it was just simply a matter of the parties confirming that we were moving forward, that the trial portion was concluded. Thank you, counsel. Thank you. Well, now you know the environment that Nick Sewardson worked in since 1998, up until 2011. And I can tell you that any time that Worthington says something is undisputed or uncontroverted, it's disputed and controverted. But Document 178 was created and filed the last day of the damages trial before it went to the jury, instead of going to the jury on the amount. What that document says is nobody can contest the $150,000 amount that we stipulated to. We have every right. And I wasn't going to take any chances not responding to their 50B motions. And there was also additional time on another issue that wasn't even appealed, so that we don't even need to, I don't want to waste my time on today. So that's where all the time is between. The 178 is filed before the jury's verdict? Yeah. Well, yeah. No, there's a liability phase. And I need to get back to this bifurcation issue. But there's a liability the first week of September in 2016. The last week of September is the damages phase of the trial. And so we finished up, and it's filed, I believe, this actually says it's filed September 30, 2016. And so it was filed before any 50B motions. Okay. Can I ask you a question about the merits? Did he testify that he felt vibrations when he was turning the corner, and that's how he avoided collisions? His testimony, all of that testimony is taken out of context, is given to you out of context. He testified the way that he knew the horn was working was he felt the vibrations. Well, how does he know if another forklift is coming? He sees. No, but if you can't see. They're saying you can't see, the coils are in the way, you turn the corner, another one's coming from the other side, you could run into each other. All forklift drivers, their concern now is because he's walking through the plant. So he's in addition. No, they have two concerns. They have one walking through, but the second, their main concern is operating the forklift. Okay. Well, there are special precautions, there's certification. He was certified as either October or November of 2010 on the forklift again. It is in the record. Counsel, I think you're pressing your argument, and I'm quite candidly interested in the fact question that Judge Tabar asked, and that is if Mr. Switherson is driving the forklift, if he is making, let's say he's making a turn, a 90-degree turn, and there's another forklift coming, how does he know that that forklift is coming? If that other forklift has got a roll of coil on it, or if Mr. Switherson has a roll of coil on his forklift, how does he know? Because I'm envisioning this thing where one forklift is coming down and then another one is coming at a perpendicular angle to it. So how does he know? He's watching. He's watching. And in Keith v. City of Oakland, their expert testified that there is a heightened sense of visual acuity and peripheral vision. My client was also a high school athlete, so we know that athletes have a higher peripheral vision, and he's able to do that. He was doing it. And the issue is not can he see it. There's the training to make sure that specific things are done. There's also passive travel. There's a lot of safety rules and regulations that he's been following. He's on the safety council. He has been doing it. And regardless of what Mr. Campbell is saying, we did not testify he did it every day. We testified that he did it, but there was a certain point, and when he was in shipping from 2009, he was doing it every day. There would go in spurts, but he was doing it every week. He was doing the stuff. He was certified from back on it. They're the ones. Worthington's the ones that said he was qualified to do it because they recertified it. Can a company subsequently determine it's a safety risk because they have misses? I mean, they're going to get sued. Companies can't win under some of these circumstances, right, because if they think he's a safety risk and don't take action and then there is an accident, it puts them in a precarious position. Well, you've got to prove the direct threat defense if you're going to assert it. You've got to do an individualized inquiry, and they did none of it. That's what the problem is here. They've got a guy that's been doing it for 11 years, and then they get an e-mail. They get an e-mail. They said he's been doing it since 2009. I know what they said. I'm sorry. Go ahead. I'm sorry. The jury agreed with us. Two things on this. Number one, Mr. Sewardson, he had a jury of his peers. There are three forklift drivers on our jury. Sorry to interrupt you, but did he testify that he's been doing it for 11 years? In some frequency, yes, but the last, from 2009, he was in shipping. They downplayed what he was doing in shipping. It was a temporary position, but he was there full time because he wasn't permanently assigned up to 2010. He became permanently assigned in 2010, and the whole time that he was temporarily assigned and permanently assigned, he was operating these things for every day. But in addition to his performance evaluations, talked about his safety and how he wouldn't hesitate to jump on a floor scrubber, there is just a plethora of evidence. But understand, this jury of his peers, I get it. I get it because you and I, we don't drive forklifts. That initial, like, holy smokes, can that really happen? Fair enough, and that's what Mr. Caudill said during jury selection. I get that, even to the forklift drivers. But there were three forklift drivers on our jury, and they said they would listen to us. They were Mr. Hogue and his jury selection. I mean, it's interesting. At page ID 4196 to 4197 in document 146, Mr. Bryan and page ID 4251 to 4253, and Mr. Webkin, 4202 to 4205, and then 4253 to 4254. Mr. Webkin in particular said, I don't know. And Mr. Caudill said, well, I get that. Can we, will you listen to us? Do you think that you could hear, be open to listening to what was happening and what we did, what Mr. Sewardson did? And he said, yes. This was a jury of his peers, a jury that had three forklift drivers on it that said he can do it. They all worked in an industrial setting. So if the jury says that he can do it and he's been doing it, our contention is that this panel should please confirm the jury verdict because they're the ones in the best seat to know. They heard everything, and they decided for themselves. Thank you, counsel. Your time is well expired. I'm sorry, Your Honor. The case will be submitted. Clerk may call the next case.